UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

FIREFLY DIGITAL, INC.          CIVIL ACTION NO. 6:10-0133

VERSUS                         JUDGE MELANÇON

GOOGLE, INC.                   MAGISTRATE JUDGE HANNA

## MEMORANDUM RULING AND ORDER

Before this Court is plaintiff, Firefly Digital, Inc.'s, motion by which it seeks to bar the introduction into evidence of the consumer survey, expert report, and testimony of defendant Google Inc.'s expert, Dr. Robert A. Peterson. (Rec. Doc. 56). A hearing was held at which Dr. Peterson testified. Although Firefly's president and CEO, Michael Spears, was present and had offered an affidavit in support of the motion, he did not testify, and Firefly offered no other evidence in support of its motion beyond that which was attached to its motion as exhibits.

### BACKGROUND

Firefly is a web development company based in Lafayette, Louisiana that has operated since 1998.[1]  The United States Patent and Trademark Office issued to Firefly U.S. Registration No. 3,711,998 for the mark GADGET on November 17,

---

[1] Rec Doc. 56-2 at ¶2.

2009, and U.S. Registration No. 3,730,874 for the mark WEBSITE GADGET on December 29, 2009.[2]  Firefly sued Google for infringement of Firefly's registered marks under the Lanham Act as well as other federal and state law claims.[3]  Firefly alleges that Google uses terms that are "confusingly similar" to its registered trademarks and likely to confuse the purchasing public as to the origin of the products,[4] thereby stating a case of forward confusion.[5]  On March 3, 2011, Google filed a motion for summary judgment to dismiss all of Firefly's claims against it.[6]  With regard to Firefly's Lanham Act claims, Google asserts that Firefly's trademarks are unprotectable because they are generic, or at best, descriptive but lacking in secondary meaning, and that Firefly cannot establish the likelihood of confusion

---

[2]   Rec. Doc. 56-2 at ¶¶ 10-11.

[3]   Rec. Doc. 1 at ¶ 1.

[4]   Rec. Doc. 1 at ¶ 32.

[5]   In a forward confusion case, the "trademark holder alleges [that] customers will purchase goods from the infringing junior user under the mistaken belief that they are purchasing from the senior user."  *Visible Systems Corp. v. Unisys Corp.*, 551 F.3d 65, 71-72 (1st Cir. 2008).  See, also, 4 J. McCarthy, McCarthy on Trademarks and Unfair Competition § 23:10 at 23–46 (4th Ed. 2011).  In a reverse confusion case, it is alleged that customers will purchase the senior user/trademark holder's goods because they mistakenly believe that the junior user/infringer is the source of the senior user's goods. *Visible Systems Corp. v. Unisys Corp.*, 551 F.3d at 72; McCarthy on Trademarks, § 23:10, at 23–47.

[6]   The motion for summary judgment is currently pending before United States District Judge Tucker L. Melançon.  (Rec. Doc. 37).

necessary to prove trademark infringement.[7] In support of its defenses, Google cites the report of a consumer survey conducted by its expert, Dr. Robert A. Peterson.[8] According to Google, the survey was intended to show that "the consuming public unambiguously finds Firefly's marks Gadget and Website Gadget to be generic and to lack secondary meaning."[9]

Firefly contends that Dr. Peterson's methodology used in the consumer surveys to test the alleged genericness and lack of secondary meaning of Firefly's marks is unreliable. In particular, Firefly argues that Dr. Peterson's survey: (1) did not include Firefly's potential consumers in the universe of persons surveyed; (2) used an inappropriate geographic universe; and (3) failed to include a "prompt" informing the persons being surveyed of the web/software context of Firefly's marks.

---

[7] A generic term, such as "airplane" or "computer," refers to an entire class of products, does not distinguish a product at all, and therefore receives no protection under trademark law. *Sport Supply Group, Inc. v. Columbia Gas Co.*, 335 F.3d 453, at 461 n. 7 (5th Cir. 2003). Descriptive terms ordinarily cannot be protected as trademarks, but they can become valid marks if they acquire a secondary meaning in the minds of the consuming public. *Zatarains, Inc. v. Oak Grove Smokehouse, Inc.*, 698 F.2d 786, 790 (5th Cir. 1983) (overruled on other grounds). A term has secondary meaning when "the primary significance of the term in the mind of the consuming public is not the product but the producer." *Security Center, Ltd. v. First Nat'l Security Centers*, 750 F.2d 1295, 1301 (5th Cir. 1985). See, also, *Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F.3d 526, 540 (5th Cir. 1998).

[8] Rec. Doc. 56-3.

[9] Rec. Doc. 72, p. 2.

## ANALYSIS

**A.    THE LEGAL STANDARD**

A district court determines the admissibility of expert testimony under Rule 702 of the Federal Rules of Evidence, according to the directions of Rule 104(a) of the Federal Rules of Evidence.[10]

> In short, the court must find that the expert testimony is both relevant and reliable before it will be admitted. To do this, the court determines whether the reasoning and methodology underlying the expert's testimony is scientifically valid and can be properly applied to the facts of the case. Evaluating the reliability of proffered expert testimony, the district court looks beyond credentials and makes sure that there is an adequate 'fit' between data and opinion.[11]

While the Supreme Court, in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993), lists several factors that may be considered in assessing the reliability of expert testimony, it has since emphasized that the analysis is a flexible one.[12] Particular *Daubert* factors may be more or less pertinent to the district court's inquiry, depending on the nature of the issue, the particular expertise, and the subject

---

[10]    *Chan v. Coggins*, 294 Fed. App'x 934, 937 (5th Cir. 2008), citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592-93 (1993).

[11]    *Chan v. Coggins*, 294 Fed. App'x at 937 (internal citations omitted).

[12]    *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137,150 (1999).

of the expert's testimony.[13] The objective is that the district court make certain that an expert, "whether basing testimony on professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."[14] "[The party seeking to have the district court admit expert testimony must demonstrate that the expert's findings and conclusions are based on the scientific method, and, therefore, are reliable. ... The proponent need not prove to the judge that the expert's testimony is correct, but she must prove by a preponderance of the evidence that the testimony is reliable."[15]

"Surveys and customer questionnaires are admissible, if they are pertinent to the inquiry, upon a showing that the poll is reliable and was compiled in accordance with accepted survey methods."[16] In fact, the Fifth Circuit has found "that survey evidence is the most direct and persuasive way of establishing secondary meaning."[17] Methodological errors in a survey generally affect the weight accorded to the

---

[13] *Kumho Tire v. Carmichael*, 526 U.S. at 150.

[14] *Kumho Tire v. Carmichael*, 526 U.S. at 152.

[15] *Moore v. Ashland Chemical*, 151 F.3d 269, 276 (5th Cir. 1998) (internal citation omitted).

[16] *C. A. May Marine Supply Co. v. Brunswick Corp.*, 649 F.2d 1049, 1054 (5th Cir. 1981).

[17] *Zatarains Inc. v. Oak Grove Smokehouse, Inc.,* 698 F.2d 786, 795 (5th Cir. 1983) (overruled on other grounds), citing *Vision Center v. Optiks, Inc.*, 596 F.2d 111, 119 (5th Cir. 1979); *Aloe Creme Laboratories, Inc. v. Milsan, Inc.*, 423 F.2d 845, 849 (5th Cir. 1970).

evidence rather than its admissibility.[18] "In some cases, however, serious flaws in a survey will make any reliance on that survey unreasonable."[19] In this case, Firefly contends that Dr. Peterson's genericness and secondary meaning surveys are so flawed that they should be excluded.

### B. FIREFLY'S MOTION TO EXCLUDE DR. PETERSON

Firefly does not contest the qualifications of Dr. Peterson, nor does it contest that a survey/opinion on whether the marks are generic or lack secondary meaning is relevant to the issues before the court. Rather, the entire focus of Firefly's motion is the reliability of the methodology utilized by Dr. Peterson in three specific areas.

### (1) FIREFLY CONTENDS THAT DR. PETERSON SURVEYED AN IMPROPER UNIVERSE.

Dr. Peterson conducted a "Teflon survey" to determine whether Firefly's marks are generic or have secondary meaning. "In a 'Teflon Survey,' respondents are first given an explanation of the difference between generic and brand names and are then

---

[18] *Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 477, 488 (5th Cir. 2004); *Zatarains v. Oak Grove Smokehouse,* 698 F.2d at 797; *Exxon Corp. v. Texas Motor Exchange of Houston, Inc.*, 628 F.2d 500, 507 (5th Cir. 1980); *Holiday Inns, Inc. v. Holiday Out In America*, 481 F.2d 445 (5th Cir. 1973) (holding that the format of the survey questions and the manner of conducting the survey is for consideration as to the weight of this evidence).

[19] *Scott Fetzer v. House of Vacuums*, 381 F.3d at 488.

asked to classify different terms, including the disputed name, as one of these two types."[20]

"Consumer surveys are routinely admitted in trademark cases to show genericness of a mark,"[21] and "[s]urvey evidence is the preferred method of determining secondary meaning."[22] However, "[f]or a survey to be valid, 'the persons interviewed must adequately represent the opinions which are relevant to the litigation.'"[23] In other words, the universe of persons surveyed "is that segment of the population whose perceptions and state of mind are relevant to the issues in the case."[24] Utilizing a proper universe is critical because asking proper questions of the wrong persons has the potential for making the results of the survey irrelevant.[25] If a universe is over-inclusive, it includes persons whose perceptions are not relevant and skews the results by including irrelevant data.[26] If a universe is under-inclusive,

---

[20] *Great American Restaurant Co. v. Domino's Pizza LLC*, No. 4:07cv52, 2008 WL 7440300, *1 (E.D.Tex. Apr. 21, 2008).

[21] *Pilates, Inc. v. Current Concepts, Inc.*, 120 F.Supp.2d 286, 302 (S.D.N.Y. 2000).

[22] *Zatarains v. Oak Grove Smokehouse*, 698 F.2d at 795.

[23] *Scott Fetzer v. House of Vacuums*, 381 F.3d at 487, quoting *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 264 (5th Cir. 1980).

[24] McCarthy on Trademarks, § 32:159, at 32-319-20.

[25] McCarthy on Trademarks, § 32:159, at 32-320.

[26] McCarthy on Trademarks, § 32:161, at 32-325.

it leaves out persons whose perceptions are relevant, again skewing the survey's results.[27]

Dr. Peterson testified that, based on historical tradition and jurisprudence applicable to defining a target universe, an appropriate universe for a secondary meaning or genericness survey would include the buying class, the consuming public, the actual and/or potential customers, or the target market for a product. In order to construct such a universe, he first reviewed Firefly's complaint, which alleges at Paragraph 17 that Firefly's "marks have each become well and favorably known to the consuming public and the trade;" and alleges at Paragraph 18 that through the marketing, promotion, and sale of its marks, "Firefly has earned and established an outstanding reputation in the industry and among consumers." From these allegations he concluded the targeted universe should include Firefly's customers and its competitors.

The complaint further alleges in Paragraph 32 that Google uses terms confusingly similar to Firefly's marks that are "likely to cause confusion, mistake, or deception among the trade and the purchasing public;" and that "Google has induced purchasers and others to believe" that Google's products are connected to Firefly in some way. In Paragraph 34, Firefly alleges that Google uses certain terms "to

---

[27] McCarthy on Trademarks, § 32:161, at 32-327.

confuse and deceive purchasers." Dr. Peterson also noted that the complaint mentions that Firefly's products are used for developing websites.

From these allegations, Dr. Peterson concluded that the targeted universe should include actual and potential purchasers of the relevant products by people involved in website creation, design, developing, and testing.

Next Dr. Peterson looked at the Firefly website which states, "We serve customers all over the U.S. and international customers too!"[28] He did not examine Firefly's customer list attached to its motion as he did not have it at the time. From these allegations, Dr. Peterson defined the geographic scope of the universe to include a national database.

From the sum total of the information available to him, Dr. Peterson created the following universe:

> The targeted universe consists of individuals 18 years of age or older:
> - who work for a company involved in creating, designing, developing, or testing websites; and
> - who are personally involved in creating, designing, developing, or testing websites for their company or their company's customers.[29]

---

[28]    Rec. Doc. 72-5.

[29]    Rec. Doc. 56-3 at 4.

According to Dr. Peterson's report, this universe includes Firefly's potential customers.[30]

Dr. Peterson testified that, after the targeted universe is determined, the next steps in the process are to determine the sampling frame, develop a questionnaire, develop a questioning process and finally, determine the sample itself. Firefly does not explicitly quarrel with the methodology followed after the universe was determined other than the lack of a prompt discussed below, yet the Court finds that each of these steps has the effect of enhancing the reliability of the survey as explained below.

Firefly contends that Dr. Peterson surveyed persons whose opinions are not relevant because he questioned only "website designers working for website design firms"[31] who do not fairly represent Firefly's customers or potential customers. Firefly argues that other website design firms represent its competitors rather than its customers, which include "ordinary businesses, government agencies, colleges, and professional[s] such as law firms and doctor offices."[32]

---

[30] Rec. Doc. 56-3 at 4.

[31] Rec. Doc. 56-1 at 8.

[32] Rec. Doc. 56-1 at 8.

Dr. Peterson's report indicates that he included in his survey individuals who work for and who are personally involved in web "creating, designing, developing or testing."[33] Dr. Peterson also testified that, after going through the process described above, of the 801 people questioned in the final survey sample, 47% of them were individuals associated with firms that identified themselves as exclusively providing web-design services while 53% were associated with firms that did not solely provide web-design services. Therefore, the targeted universe, while potentially broad at first, was refined to reflect a nearly equal ratio of those exclusively in the web creation and design business to those who were not.

Firefly cites *Amstar Corp. v. Domino's Pizza, Inc.*[34] for the proposition that "one of the most important factors in assessing the validity of an opinion poll is the adequacy of the 'survey universe,' that is, the persons interviewed must adequately represent the opinions which are relevant to the litigation." In that case, the court found that "[t]he appropriate universe should include a fair sampling of those purchasers most likely to partake of the alleged infringer's goods or services."[35]

---

[33] Rec. Doc. 56-3 at 4.

[34] 615 F.2d 252, 264 (5th Cir. 1980).

[35] *Amstar v. Domino's Pizza*, 615 F.2d at 264.

-11-

The survey discussed in the *Amstar* was designed for the purpose of testing whether there was a likelihood of confusion between the two parties' products.[36] When a survey is conducted to test the likelihood of confusion between two products, the potential buyers of the products should be surveyed. More particularly, when the case claims forward confusion, the proper universe to survey is the potential buyers of the junior user's product, but when reverse confusion is alleged, the universe should be comprised of the senior user's customer base.[37]

Although this is a forward confusion case, the surveys conducted by Dr. Peterson in this case were not likelihood of confusion surveys. Instead, they were designed for the purpose of testing the genericness of Firefly's marks and whether the marks have any secondary meaning. Therefore, the universe to be surveyed is not necessarily limited to the potential buyers of Firefly's product. Instead, the proper universe would be broader and include the likely purchasers of both parties' products.[38]

---

[36] *Amstar v. Domino's Pizza*, 615 F.2d at 263.

[37] McCarthy on Trademarks, § 32-159, at 32-320-21.

[38] In *J & J Snack Foods, Corp. v. Earthgrains Co.*, 220 F.Supp.2d 358, 371 (D.N.J. 2002), the court suggested that the proper universe for a genericness survey was "the full range of potential [consumers] for whom plaintiff and defendants" compete, quoting *Am. Home Prods. Corp. v. Barr Lab.*, 656 F.Supp. 1058 (D.N.J.1987), *aff'd*, 834 F.2d 368 (3d Cir. 1987).

The claimed defects in Dr. Peterson's survey universe are unlike the flagrant methodological errors that were inherent in the *Amstar* poll. In contrast to the facts of *Amstar*, Dr. Peterson's report indicates that he attempted to include Firefly's consumer base by polling participants with knowledge of websites. Dr. Peterson opined that using a broader universe, such as any individual or organization with a website, as Firefly suggests, would be less likely to include participants who might have encountered or be familiar with Firefly's products.[39] The jurisprudence is clear that "an imperfect universe is not fatal to the surveys' admissibility."[40] The use of an inappropriate universe "generally affects the weight of the resulting survey data, not its admissibility."[41]

The Court finds that Google has met its burden of proof that Dr. Peterson used a reliable approach, based on the information set forth in Firefly's complaint and its representations to the public, to construct a universe that includes persons likely to purchase products from either Firefly or Google. The evidence shows that the methodology used to determine the final universe of people surveyed by Dr. Peterson

---

[39] Rec. Doc. 56-3 at 4.

[40] *Shell Trademark Management B.V. v. Warren Unilube, Inc.*, No. H-09-2851, 2011 WL 607340, *4 (S.D. Tex. Jan. 10, 2011), citing McCarthy on Trademarks, § 32:162 ("Even if a survey does not target what the court considers to be the optimal universe, the results may be so compelling that it still supports the factual finding for which is was intended.")

[41] McCarthy on Trademarks, § 32:162, at 32-333.

...

is reliable for the purpose for which it was intended, to determine genericness and lack of secondary meaning, and is not so flawed to the extent that the Dr. Peterson's consumer survey, expert report, and testimony are inadmissible.

### (2) FIREFLY CONTENDS THAT THE SURVEY UNIVERSE IS GEOGRAPHICALLY TOO BROAD.

Firefly also contends that the survey universe included a "dramatically disproportionate number of persons with little or no exposure to Firefly's goods or services."[42]  Firefly represents in its motion that approximately five percent of its customers reside in states other than Louisiana, but only .07 % of the persons surveyed were located in Louisiana.  Google responds that "this motion is the first time in this litigation that Firefly has claimed that the relevant consumer base is limited to Louisiana."[43]  In Google's First Set of Interrogatories, Interrogatory No. 4, Google asked Firefly what it had to support the allegation in Paragraph 17 of its Complaint that its mark "Gadget" is a "famous mark."  In response, Firefly stated that it has customers "located in several U.S. states and [ ] other countries."[44]

---

[42]    Rec. Doc. 56-1 at 9.

[43]    Rec. Doc. 72 at 8.

[44]    Rec. Doc. 72-4.

Firefly submitted a copy of its client list along with its reply memorandum in support of its motion,[45] which establishes that the majority of its clients are in Louisiana. Dr. Peterson testified that he did not review Firefly's client list before formulating the survey universe. Instead, he based the survey universe on information set forth in Firefly's complaint and website, both of which characterize Firefly as a company with a national client base.

Although it is permissible to narrow a survey universe geographically,[46] the undersigned finds that Dr. Peterson reasonably formulated the universe based on the geographical information that he possessed at the time. Although this may not be the best geographical scope for the universe, the Court finds that Google has met its burden that the methodology to establish the geographical basis for the universe is reliable and the universe is not so flawed that Dr. Peterson's consumer survey, expert report, and testimony are inadmissible.

---

[45]   Rec. Doc. 73-2.

[46]   McCarthy on Trademarks, § 32-159, at 32-321.

### (3) FIREFLY CONTENDS THAT THE GENERICNESS SURVEY LACKED CONTEXT.

Finally, Firefly asserts that Dr. Peterson's survey included no "prompt" for the web/software context in that it did not apprise the participant of the nature of the goods or services under which Firefly's GADGET or WEBSITE GADGET marks are used. Dr. Peterson's report indicates that a potential participant was asked whether his company was involved in creating, designing, developing, or testing websites, and then whether he himself was involved in one of these activities involving websites.[47] Only individuals who answered "yes" to both screening questions regarding "websites" participated in the survey.[48] The Court finds that, because the targeted universe was limited to individuals who create, design, develop, or test websites, there was no need to provide additional context in the body of the survey. For that reason, the Court finds that the alleged lack of context does not make Dr. Peterson's consumer survey, expert report, and testimony inadmissible.

---

[47] Rec. Doc. 56-3 at Attachment 4.

[48] Rec. Doc. 56-3 at Attachment 4.

## Conclusion

The methodology utilized by Dr. Peterson to determine the universe for a genericness and secondary meaning survey is based on an accepted method and is reliable. The Court further finds that the methodology followed by Dr. Peterson to create the targeted universe to be sampled, i.e. relying on the allegations of the plaintiff's complaint and public representations, was likewise reliable and adequately met the goals sought to be achieved by the criteria for determining the universe in a genericness and secondary meaning survey.

For the foregoing reasons,

**IT IS ORDERED** that Firefly Digital, Inc.'s Daubert Motion To Exclude Expert Dr. Robert A. Peterson (Rec. Doc. 56) is **DENIED**.

Thus done and signed this 7th day of July 2011 at Lafayette, Louisiana.

Patrick J. Hanna
United States Magistrate Judge
800 Lafayette St., Suite 3500
Lafayette, Louisiana 70501
(337) 593-5140 (phone) 593-5155 (fax)