# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### LAFAYETTE DIVISION

| | |
|---|---|
| Firefly Digital Inc. | Civil Action No. 10-0133 |
| versus | Judge Tucker L. Melançon |
| Google Inc. | Magistrate Judge Patrick J. Hanna |

## MEMORANDUM RULING

Before the Court is a Motion for Summary Judgment filed by Google Inc. ("Google") [Rec. Doc. 37], a memorandum in opposition filed by Firefly Digital, Inc. ("Firefly") [Rec. Doc. 58] and Google's reply thereto [Rec. Doc.71].  For the reasons that follow, the Motion will be granted.

### I. Background

Firefly filed this action against Google seeking recovery of monetary damages, penalties and injunctive relief arising from trademark infringement and unfair competition under the Lanham Act, 15 U.S.C. § 1051, *et seq*, and the Louisiana Unfair Trade Practices Act ("LUTPA"), La.Rev.Stat. Ann. § 51:1401, *et seq*.

### Firefly Digital, Inc.

Firefly is a web-development company, offering web design and custom web application development and hosting, which has operated since 1998 in Lafayette, Louisiana. *R. 58, Exh. A, Spears Decl.; R. 38, Braunig Decl., Exh. 1, Spears Depo. At 134:9-11.* Michael L. Spears has served as the President and Chief Executive Officer of Firefly since

1

its inception.  *R. 58, Exh. A, Spears Decl.*  In 2001, Firefly created a website content management system ("CMS") that enables Firefly's clients to independently manage the content of their websites.  Firefly also developed a "suite of add-on applications" for use in conjunction with its CMS.  The add-on applications are used to create and update widgets[1] which are displayed on a client's website.  Firefly contends that its CMS and add-on applications were designed to allow non-technical persons to quickly add, edit, and delete the pages and content of a website.  Firefly creates its clients' website using the CMS, then hands the website over to the client for control of the website content.  Firefly's CMS and its add-on applications are not displayed on any customer's website.  Instead, the CMS and the add-on applications are background tools used by the client to make changes to what appears on the client's website.

Beginning in 2002, Firefly began marketing and selling its CMS under the term "WEBSITE GADGET," and marketing and selling its add-on applications under the term "GADGET."  Also in 2002, Firefly filed and obtained Louisiana state trademark registrations for "WEBSITE GADGET," "TRAFFIC GADGET," "PAGE GADGET," "NEWSLETTER GADGET," "INTRANET GADGET," and "FIREFLY GADGET & LOGO."  *R. 58, Exh. A, Spears Decl.*, ¶ 15.

On April 27, 2009, Firefly filed a federal trademark and service mark application to

---

[1]  Spears states that the Oxford Dictionaries, Online, defines "widget" as "a small gadget or mechanical device, especially one whose name is unknown or unspecified," and as "an application, or a component of an interface, that enables a user to perform a function or access a service" and states "Origin: 1930s: perhaps an alteration of GADGET." *R. 58, Exh. 5.*

register the mark "WEBSITE GADGET" for "computer software, namely, a content management system for websites" and for the services of "installation and configuration of a content management system for websites." *Id.* On the same day, Firefly filed a federal trademark and service mark application to register the mark "GADGET" for "computer software, namely, add-on applications for a content management system for websites" and for the services of "implementation and configuration of add-on applications for a content management system for websites." *Id.* On November 17, 2009, the United States Patent and Trademark Office issued to Firefly, U.S. Registration No. 3,711,998 for the mark "GADGET." *Id., at Exh. A-3.* On December 29, 2009, the Trademark Office issued to Firefly, U.S. Registration no. 3,730,874 for the mark "WEBSITE GADGET."[2] *Id., at Exh. A-4.*

## *Google, Inc.*

Google originally started as a search engine in 1998 and now offers products and services ranging from the Google.com search feature, You Tube and Gmail to Google Maps, Google Docs, a collaborative document sharing program, and the Picasa photo service. *R. 39,* Decl. of Jaffe, ¶¶ *1-3.* In early 2006, Google decided to add discrete mini-applications such as news feeds, stock quotes, maps, interactive games, etc., that users could add to two

---

[2] Firefly refers to its Marks in all uppercase letters. The federal trademark certificates for GADGET and WEBSITE GADGET, however, are printed in only uppercase letters and state, "THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT, STYLE, SIZE, OR COLOR." *R. 45, Exh. 59.* Accordingly, the Court's reference to Firefly's Marks as "GADGET" and "WEBSITE GADGET" have no significance as to their distinctiveness.

existing Google products, iGoogle (then referred to as "Google Personalized Homepage")

and Google Desktop.  *Id. at ¶ 4.*  Deborah Jaffe, Google's Consumer Product Marketing

Director from August 8, 2002 to July 7, 2010, was part of the internal Google team

responsible for choosing a name for Google's mini-applications.  *Id. at ¶ 5.*  Initially, Jaffe's

team evaluated what names other companies were using to identify similar mini-applications

and identified two "category names" - gadgets and widgets.  *Id. at ¶ 6.*  "Gadget" was a name

most prominently used by Microsoft and "widgets" was the name used by at least Yahoo! and

Apple.  *Id.*  After considering more than two dozen possible names, the name "Google

Gadgets"[3] was selected.  *Id. at ¶¶ 7 & 8.*  The decision was driven in large part by the fact

that Microsoft was in the process of launching the Windows Vista operating system and the

team believed that gadgets would become the dominant industry term for mini-applications.

*Id. at ¶ 8.*     Before launching Google Gadgets, Google retained CT Corsearch, a trademark

search firm, to conduct a search and review of registered federal and state trademarks, as well

as business names, websites, and traditional media for common uses of "gadgets" and

"Google Gadgets" in a variety of trademark classes relating to software and the internet.[4]  *Id.*

*at ¶ 9, Exh. B, Parts 1-21.*  While Firefly's Louisiana marks for "WEBSITE GADGET,"

---

[3]  Google made the determination that the term gadget would be capitalized only when it was
used with Google.  *Id. at ¶ 11.*  In 2008, Google made the decision to "debrand" gadgets - to stop
referring to them as Google Gadgets, and publicly refer to them only as gadgets (with a lower-case
"g").  *R. 40, Hjelmstad Decl., ¶ 13.*

[4] Google also undertook a Worldwide Identical Screening Search trademark search to identify
trademarks including the word gadget outside the United States.  *Id. at ¶ 10, Exh. C.*

"TRAFFIC GADGET," "PAGE GADGET," "INTRANET GADGET," and "NEWSLETTER GADGET" appeared among the hundreds of registered or abandoned trademarks incorporating the word gadget in the Corsearch search, none of the Firefly marks identified uses of "gadget" as marks for mini-applications.  *Id. at ¶ 11, Exh B at G-FF-0633286, G-FF-0633290-92, G-FF-0633591.*

Google formally introduced Google Gadgets in May 2006 as discrete software modules, such as calculators and weather reports, that can be added to their iGoogle webpage free of charge.  *R. 40, Hjelmstad Decl., ¶¶ 3, 7; R. 39, Jaffe Decl., Exh. A.*  The majority of Google Gadgets are developed by third parties, not Google.  *R. 40, ¶ 5.*  Google has not earned any revenue from Google Gadgets or any of the products associated with Google gadgets.  *Id. at ¶ 6.*  In 2007, Google offered a product called "Gadget Ads."  Gadget Ads are not mini-applications that a user can add to his iGoogle page or desktop, but rather are used only with Google's dealings with advertisers and the term gadget is not displayed on the advertisements.  *R. 41, Oestlien Decl., ¶¶ 3, 4, 5.*  Firefly was aware of Google's gadgets by May 4, 2008, and perhaps a month earlier.  *R. 45-1, Exh. 1, 12/30/2010 Depo. Of Spears, 235:5-25.*

In May 2009, Firefly sent a letter to Google alerting Google to Firefly's Marks.  *Id. at 246:7-14.*  Firefly filed this action against Google on January 29, 2010, alleging six counts of trademark infringement, dilution and unfair competition under both the federal Lanham act and Louisiana state law.  *R. 1.*  Firefly contends that Google's use of the terms "Google

Gadgets," "Google Gadgets Editor," "Google Gadget Ventures," "Gadgets API" and "Gadget" are without Firefly's permission, imitates Firefly's registered marks, GADGET and WEBSITE GADGET, and are likely to cause confusion and induce the trade and the purchasing public to believe that "Google's business, goods and services" are connected with Firefly.  *Id., ¶¶ 31-33.*  In its Answer, Google asserts twelve affirmative defenses and counterclaims for cancellation of Firefly's Marks and a declaratory judgment alleging that it has not infringed Firefly's marks.  *R. 11.*

## II.  Summary Judgment Standard

A motion for summary judgment shall be granted if the pleadings, depositions and affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56;  *Little v. Liquid Air Corp.*, 37 F.3d 1069 (5th Cir.1994)(en banc).  Initially, the party moving for summary judgment must demonstrate the absence of any genuine issues of material fact. When a party seeking summary judgment bears the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if such evidence were uncontroverted at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  As to issues which the nonmoving party has the burden of proof at trial, the moving party may satisfy this burden by demonstrating the absence of evidence supporting the nonmoving party's claim. *Id.* If the moving party fails to carry this burden, his motion must be denied. If he succeeds, however,

the burden shifts to the nonmoving party to show that there is a genuine issue for trial.[5] *Id.* at 322-23.

Once the burden shifts to the respondent, he must direct the attention of the court to evidence in the record and set forth specific facts sufficient to establish that there is a genuine issue of material fact requiring a trial. *Celotex Corp.,* 477 U.S. at 324; Fed.R.Civ.Pro. 56(c). The responding party may not rest on mere allegations or denials of the adverse party's pleadings as a means of establishing a genuine issue worthy of trial, but must demonstrate by affidavit or other admissible evidence that there are genuine issues of material fact or law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144. 159 (1970); *Little*, 37 F.3d at 1075. There must be sufficient evidence favoring the nonmoving party to support a verdict for that party. *Anderson,* 477 U.S. at 249; *Wood v. Houston Belt & Terminal Ry.,* 958 F.2d 95, 97 (5th Cir.1992). There is no genuine issue of material fact if, viewing the evidence in the light most favorable to the nonmoving party, no reasonable trier of fact could find for the nonmoving party. *Lavespere v. Niagara Mach. & Tool Works, Inc.,* 910 F.2d 167, 178 (5th Cir.1990).

If no issue of fact is presented and if the mover is entitled to judgment as a matter of

---

[5] Where the nonmoving party has the burden of proof at trial, the moving party does not have to produce evidence which would negate the existence of material facts. It meets its burden by simply pointing out the absence of evidence supporting the non-moving party's case. *Celotex Corp.,* 477 U.S. at 325.  To oppose the summary judgment motion successfully, the non-moving party must then be able to establish elements essential to its case on which it will bear the burden of proof at trial. A complete failure of proof by the non-moving party of these essential elements renders all other facts immaterial. *Id.* at 322.

law, the court is required to render the judgment prayed for.  Fed. R. Civ. P. 56(a);  *Celotex*

*Corp.*, 477 U.S. at 322.  Before it can find that there are no genuine issues of material fact,

however, the court must be satisfied that no reasonable trier of fact could have found for the

nonmoving party.  *Id.*

### III. Analysis

Firefly seeks recovery of monetary damages, penalties and injunctive relief allegedly

arising from Google's infringement of Firefly's federal and state registered trademarks and

service marks, WEBSITE GADGET and GADGET.  In particular, Firefly alleges that

Google's actions constitute the following federal claims under the Lanham Act, 15 U.S.C.

1051, *et seq*.: (1) intentional infringement of Firefly's federally registered marks in violation

of 15 U.S.C. § 1114; (2) intentional use of a false designation of origin, false description,

and/or false representation in violation of 15 U.S.C. § 1125(a); (3) intentional dilution of the

distinctive quality of Firefly's registered marks in violation of 15 U.S.C. § 1125(c), and the

following state law claims under LUPTA: (4) intentional infringement in violation of La.

R.S. 51:222; (5) injury to Firefly's business reputation and/or dilution of Firefly's marks in

violation of La. 51:223.1; and (6) unfair competition and unfair and deceptive acts in

violation of La. R.S. 51:1405.  *R. 1, ¶¶ 38-49.*  Firefly also requests injunctive relief against

Google from any further use of the terms "Google Gadgets," "Google Gadgets Editor,"

"Google Gadget Ventures," "Gadgets API" and "Gadget" in association with website

development and/or customization, including widget development and promotion.  *R. 1.*

Google moves for summary judgment on all six counts in Firefly's Complaint, its counterclaims for cancellation of Firefly's federal and state trademarks, and in the alternative, its statute of limitations affirmative defense as to Firefly's state unfair competition claim. *R. 38.*

### A. Trademark Infringement under the Lanham Act

"Trademark and service mark infringement claims are governed by the Trademark Act of 1946 (Lanham Act), 15 U.S.C. §§ 1051 *et seq.*" *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 235  (5th Cir. 2010).  The Lanham Act provides that a trademark may be "any word, name, symbol, or device, or any combination thereof" that is used or intended to be used "to identify and distinguish" a person's goods "from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown." *Board of Supervisors for Louisiana State University Agricultural and Mechanical College v. Smack Apparel Co.*, 550 F.3d 465, 475 (5th Cir. 2008).

To prevail on its trademark infringement claim, Firefly, must first establish that it possesses a valid, legally protectable mark, and second, that Google's subsequent use of a similar mark is likely to create confusion as to the origin of the product at issue. *Amazing Spaces*, 608 F.3d at 235.  To be valid and protectable, a mark must be capable of distinguishing the products it marks from those of others. *Two Pesos, Inc. v. Taco Cabana, Inc.*,  505 U.S. 763, 768 (U.S. 1992) (citing 15 U.S.C. § 1052). "To determine whether a word or phrase is protectable, it must first be determined into which category, (1) generic,

(2) descriptive, (3) suggestive, or (4) arbitrary or fanciful, the word or phrase belongs.  The significance of assigning a word or phrase to one of these categories is that the assignment determines whether or not, or in what circumstances, the word or phrase is eligible for trademark protection. Generic terms are never eligible for trademark protection. Descriptive terms may only be protected after proof of secondary meaning, and suggestive, arbitrary or fanciful terms are all protectable without proof of secondary meaning." *Union Nat. Bank of Texas, Laredo, Tex. v. Union Nat. Bank of Texas, Austin, Tex.*, 909 F.2d 839, 844-845 (5th Cir. 1990).  The appropriate categorization is not self-evident and while it has many attributes of a question of law, the categorization of a term is properly considered a matter of fact.  *Id.* at 846.  Because legal consequences attach to the assignment of a word or phrase to one of these categories, the Court must examine what the law says about each category. *Id.*

Here, only the first two categories, generic and descriptive, are at issue.  "A generic term is one which identifies a genus or class of things or services, of which the particular item in question is merely a member."  *Id.* at 844.  "A descriptive term is one that 'identifies a characteristic or quality of the article or service." *Id.* at 845.  Descriptive terms ordinarily are not protectable as trademarks; they may become valid marks, however, by acquiring a secondary meaning, or distinctiveness, in the minds of the consuming public.  *Security Center, Ltd. v. First Nat. Sec. Centers*, 750 F.2d 1295, 1298 (5th Cir. 1985).  "To establish secondary meaning, a plaintiff must show that the primary significance of the term in the

mind of the consuming public is not the product but the producer." *Id.* at 1301.

Firefly registered, "GADGET" and "WEBSITE GADGET" ("Marks") with the Federal Patent and Trademark Office ("PTO").   A certificate of registration with the PTO is prima facie evidence that the mark is registered and valid (i.e., protectable), that the registrant owns the mark, and that the registrant has the exclusive right to use the mark in commerce. *See* 15 U.S.C. § 1115(a); *Xtreme Lashes, LLC v. Xtended Beauty, Inc*., 576 F.3d 221, 232 (5th Cir. 2009).   As a result, when a plaintiff sues for infringement of its registered mark, the defendant bears the burden to rebut the presumption of the mark's protectibility by a preponderance of the evidence. *Id*.   "If sufficient evidence of [non-distinctiveness] is produced to rebut the presumption, the presumption is 'neutralized' and essentially drops from the case, although the evidence giving rise to the presumption remains." *Amazing Spaces*, 608 F.3d at 238-239 (citations omitted).

Google contends that Firefly's Marks are generic, but in the alternative, they are at the very least, descriptive terms which have not attained secondary meaning, and as such are incapable of trademark protection.   Google further contends that Firefly cannot demonstrate any likelihood of confusion between its Marks, GADGET and WEBSITE GADGET, and Google's gadgets.   Firefly argues that material facts remain at issue as to each of Google's grounds for summary judgment.

### 1. Whether "GADGET" Is Generic

Notwithstanding Firefly's registration of the terms at issue, Google argues that the

term gadget is generic and is therefore unprotectable under the Lanham Act.  In particular, Google asserts that gadget is a widely used generic term of applications that can be embedded in a website or intranet portal site.  "A 'generic mark,' which refers to an entire class of products (such as 'airplane' or 'computer'), does not distinguish a product at all, and therefore receives no protection under trademark law.  *See Two Pesos*, 505 U.S. at 768; William M. Landes & Richard A. Posner, Trademark Law: An Economic Perspective, 30 J. Law & Econ. 265, 291 (1987)."  *Sport Supply Group, Inc. v. Columbia Cas. Co.,* 335 F.3d 453, 461 n. 7 (5th Cir. 2003).   "The terms 'generic' and 'trademark' are mutually exclusive. McCarthy on Trademarks and Unfair Competition § 12.01 at 12-3 (12th ed. 1992)."  *Society of Financial Examiners v. National Ass'n of Certified Fraud Examiners Inc*., 41 F.3d 223, 226 (5th Cir. 1995).  "[T]he test for genericness [sic] is whether the public perceives the term primarily as the designation of the article.  *Blinded Veterans Assoc. v. Blinded American Veterans Foundation*, 872 F.2d 1035, 1041 (D.C.Cir.1989) (Ginsburg, R.B., J.) (holding 'blinded veterans association' generic) .... Put another way, 'the primary significance of' a trademark 'in the minds of the consuming public is not the product but the producer.' *Kellogg Co. v. National Biscuit Co.*, 305 U.S. 111, 118 (1938)."  *Society of Financial Examiners*,  41 F.3d 227.

The Court may consider several factors when determining whether a mark is generic, including "uncontested generic use by competitors, generic use by the plaintiff, dictionary definitions, media usage, testimony of persons in the trade and consumer surveys."  *See*

McCarthy on Trademarks and Unfair Competition § 12:13 (4th ed. 2010); *March Madness Athletic Ass'n, L.L.C. v. Netfire, Inc.*, 162 F.Supp.2d 560, 568 -569 (N.D.Tex. 2001); *DVH Companies, Inc. v. Bropfs Corp.*, 2007 WL 3284324, 3  (N.D.Tex. 2007); *Racetrac Petroleum, Inc. v. J.J.'s Fast Stop, Inc.*, 2003 WL 251318 (N.D.Tex. 2003).  Google submits the following factors in support of its position that Firefly's Mark, GADGET, is generic.

### i.  Uncontested Generic Use

Google contends that throughout the period Firefly claims to have used GADGET as a designation for mini-applications, many others used the term in the same way without complaint from Firefly.  The record demonstrates that the following companies have used the term gadget in identifying similar products: (1) Plumtree Software issued multiple press releases and developed "Hundreds of gadgets" between 1999 and 2001 under its portal platform called Plumtree Portal Gadgets(TM), *R. 47-41, Exh. 88, G-FF-0632743-45*; (2) Oracle offers gadgets that consolidate information from the web and from other sources into a single webpage for business employees as well as desktop gadgets, *R. 45-11, Info Week 11/12/08; 45 -12, R. 45-13. G-FF-0 632*575; (3) Novell, a software company, started marketing mini-applications called gadgets as part of Novell Portal Services, a Web-based portal system, in September 2000, *R. 45-14*; (4) Microsoft has marketed mini-applications called "gadgets" since 2005 that can reside either on Microsoft Web sites or on any computer desktop running Windows. *R. 45-15, 11/01/05 betanews.com, article*; (5) Google represents that in 2006, it began marketing various Google gadgets, discrete software modules that can

13

be added to a webpage,  *R. 45*.  In 2007, Google offered "Gadget Ads" which are not mini-applications, but rather are used only in Google's dealings with advertisers and are not displayed on advertisements.  *Id.*

Google contends that before mid-2009 Firefly never described its mini-applications as gadgets, referring to them instead as widgets.  *R. 38, Braunig Decl., Exh. 1, Spears Depo.,237: 15-17*.  Google further contends that it was not until mid-2009, after Firefly learned about Google's gadgets and had applied for its federal trademarks,[6] that Firefly began referring to its mini-application as "GADGET."  *Id. at 82: 22-83:3; Exh. 2, Dalton Depo, 58: 13-24*.  Firefly concedes that it never complained nor took any steps to prevent these companies from using the term gadget to refer to mini-applications that can be embedded in a website or intranet site.  *R. 38, Braunig Decl. Exh. 1, Spears Depo., 183:11-184:7; 184:17-23; 178:23-179:5; 180:5-11; 186:10-15*.

### ii.  *Dictionary Definitions*

"The dictionary definition of the word is an appropriate and relevant indication 'of the ordinary significance and meaning of words' to the public."  *Vision Center*, 596 F.2d at 116, fn 13 (quoting *American Heritage Life Ins. Co. v. Heritage Life Ins. Co.*, 494 F.2d 3, 11 n.5 (5th Cir. 1974).  In support of its position that gadget is a commonly used generic term, Google cites the Macmillan Dictionary, Macmillan Publishers Limited 2009-2011, which defines "gadget"  as "a small piece of software that you can add to a website in order to

---

[6] Firefly has never applied for a Louisiana trademark for the term "GADGET."  *R. 38, Ben-Yair Decl., Exhs. A-B; Braunig Decl., Exhs. 23-28.*

14

customize it," *R. 45, Exh. 7*, as well as The Computer Desktop Encyclopedia which defines "gadget" as "(1) Slang for any hardware device, typically small. Synonymous with 'gizmo.' (2) A mini application that resides on a computer desktop or personal home page, typically found in the Windows environment. Gadgets provide myriad functions, including customized news and stock quotes, calendar, dictionary lookups, cartoons and games.  Gadgets are available for the Windows Vista and Windows 7 desktops, Google Desktop and the personal home pages of Windows Live and iGoogle. On the Mac desktop and on Yahoo personal home pages, gadgets are called 'widgets,'" *R. 45, Exh. 6, CDE - Computer Desktop Encyclopedia, Copyright 1981-2011, The Computer Language Co., Inc*. Firefly cites The Oxford Dictionaries, Online, which defines "gadget" as "a small mechanical device or tool, especially an ingenious or novel one." *R. 58, Exh. 6.*  Firefly contends that this generic definition of gadget is different from its trademark, GADGET, which is defined as a mini-application.   The Court disagrees.  Firefly's attempt to create a distinction, is one without a difference.  While each of the foregoing definitions implies that the term gadget is the generic term for a device or tool, it is the computer related definitions of gadget - "slang for any hardware device" and "mini-application" - that are most relevant and indicate the terms' genericness as used by Firefly.

### iii.  Media Usage

Google asserts that numerous third-party developers and authors have used and continue to use the term gadget to describe mini-applications including: (1) Lab Pixies, an

Israeli company acquired by Google in 2010, which has been developing and marketing gadgets for sale since 2006, *R. 38, Decl. of Ran Ben-Yur*, *¶ 2 & Exhs. A-B*; (2) Smart Web Gadgets, launched in June 2007; (3) Build a Gadget, the "leading developer of miniature applications, known as gadgets or widgets"; (4) SiteGadgets.com, "23 different gadgets to spice up your website;" (5) Appirio, "Start Page Gadgets;" (6) Gadget-Widget, a Canadian gadget developer; and (7) OnlineWebGadgets.com.  *R. 38, Braunig Decl., Exhs. 23-28.* Google contends that publications uniformly describe gadget as a generic class descriptor. It cites a number of books which have been written to address the use of gadgets as mini-applications including, *Pro Web Gadgets*, *Creating Vista Gadgets*, *Web Design: Concepts and Techniques*; *Id. at Exhs. 29-32*, and *Dave's Quick 'n' Easy Web Pages*, a 1999 book which included a full chapter on "Web Gadgets" - described as "small programs that add special features to your Web Page to make it more interesting and more interactive."  *Id. at Exh. 32, Chap. 13, G-FF-0632217.*

### iv.  Consumer Survey Evidence

Google further asserts that the consumer survey as to genericness conducted by its expert, Dr. Robert A. Peterson, *R. 44*, *Exh A*, conclusively establishes that the consuming public views the term gadget as a generic term.  The record indicates that Dr. Peterson conducted two surveys, genericness and secondary meaning.  *Id.*  "Consumer surveys are routinely admitted in trademark cases to show genericness of a mark," *Pilates, Inc. v. Current concepts, Inc.*, 120 F.supp.2d 286, 302 (S.D.N.Y 2000), and "survey evidence is the most

direct and persuasive way of establishing secondary meaning," *Zatarains,* 698 F.2d at 795 (citing *Vision Center*, 596 F.2d at 119; *Aloe Creme Laboratories*, 423 F.2d at 849; 1 J. McCarthy at § 15.12(D)).  Dr. Peterson surveyed one hundred (100) participants as to the genericness of "GADGET" and one hundred and one (101) participants as the genericness of "WEBSITE GADGET."  He surveyed two hundred (200) participants as to the secondary meaning of the Marks.  *Id.*

On April 12, 2011, Firefly filed a *Daubert* motion to exclude Peterson's report and consumer survey as unreliable under Rule 702 of the Federal Rules of Evidence.  *R. 56.*  On April 28, 2011, the Court referred the motion to the United States Magistrate Judge assigned to this case, pursuant to 28 U.S.C. § 636.  *R. 64.*  On July 7, 2011, the Magistrate Judge denied Firefly's *Daubert* motion holding that Peterson's consumer survey was fairly and scientifically conducted drawing responses from a sample of a relevant portion of potential consumers of Google, and therefore, constitutes admissible evidence in this action.  *R. 87.* Firefly filed an objection to the Magistrate Judge's order denying Firefly's *Daubert* motion, pursuant to Federal Rule of Civil Procedure 72(a), on July 21, 2011.  *R. 88.*   Google filed an opposition to Firefly's objection on August 15, 2011.  *R. 93.*  On August 25, 2011, the Court denied Firefly's objection finding that the Magistrate Judge applied the appropriate legal standards to the issues raised and did not make any clear error in his ruling and order. *R. 95.*

In administering Peterson's survey as to genericness, one hundred participants[7] were asked whether the term "Gadget" was a brand name or generic name for a software mini-application.  *Id. at pp. 4-7.*  Three percent (3%) of those surveyed believed gadget to be a brand name, compared to 89% who believed it to be a common, generic name and 8% who answered both or were uncertain.  *Id. at pp. 9-10.*  As noted by Google, "Gadget's 3% brand identification score is much lower than other marks that have been deemed generic based on survey results."  *See, e.g., Intel Corp. v. Advanced Micro Devices, Inc*.,  756 F.Supp. 1292, 1297 (N.D.Cal. 1991) (*"386" Mark found to be generic where 72% of respondents stated that "386" is a generic description and 21% of respondents stated that "386" is a brand name); *King-Seeley Thermos Co. v. Aladdin Industries, Inc*., 321 F.2d 577, 579 -580 (2d Cir. 1963) (mark found generic where 75% call any container that keeps the contents hot or cold  a "thermos" and 12% stated that "thermos" has a trademark significance).   While the Court does not rely solely on the results of the Peterson survey, it presents evidence which favors the conclusion that the term gadget "connotes the basic nature of articles or services rather than the more individualized characteristics of a particular product," and is therefore generic. *Zatarains*, 698 F.2d at 790.

Finally, Google cites *Parasol Flavors, LLC v. Snowizard, Inc*., 2010 WL 745004 (E.D.La., 2010) (J. Lemmon), as being analogous to this case.  In *Parasol Flavors*, the court considered whether or not the registered term "HURRICANE" was generic.  The court held

---

[7] Peterson surveyed an equal ratio of individuals exclusively in the web-design business and individuals not exclusively in the web-design business.  *R. 87 at p. 11.*

that because "HURRICANE" identifies a genus or class of drink sold in the French Quarter in New Orleans, the term "'connotes the basic nature' of the flavor rather than the individualized characteristic of the defendant's flavor concentrate and was therefore generic and without protection under trademark law." *Id.* at *6 (quoting *Urgent Care Inc. v. South Mississippi Urgent Care Inc.*, 289 Fed.Appx. 741, 743 (5th Cir. 2008)).

Firefly argues that because its Mark is used in connection with add-on applications for a content management system, rather than simply as a gadget, the Mark is not generic. The Court disagrees.  The record establishes that the term "gadget" is a widely used generic term which refers to an entire class of products and does not distinguish a product at all.

### 2. Whether Firefly's "GADGET" Is Descriptive

Google has met its burden of proving by a preponderance of the evidence that the term gadget is generic.  As Firefly has failed to adduce any evidence sufficient to show that the term is descriptive or that it has attained secondary meaning by becoming uniquely associated with Firefly, the Court need not consider Google's alternative allegation that the term is merely descriptive without secondary meaning.

### 3. Whether "WEBSITE GADGET" Is Generic

Google contends that Firefly's trademark WEBSITE GADGET is also generic as it is a combination of two generic terms, "website" and "gadget," which together merely create a generic term for a website-management tool.  Google cites *Small Business Assistance Corp. v. Clear Channel Broadcasting, Inc.*, 210 F.3d 278, 279 (5th Cir. 2000) in support of its

position that given the widespread generic use of gadget to refer to software applications in a web environment, the addition of the generic word website does not overcome that genericness. *R. 38.*  In *Clear Channel*, the court considered whether or not the allegedly infringing mark, "Summer Jam," was protectable.  Finding  "Summer Jam" to be a generic term for a concert occurring during the summer months, the court held that "[a] trademark cannot be infringed by the generic term for the product it designates." *Id.*  As with the combination of the generic terms summer and jam, the combination of the generic term gadget with the term website merely identifies a category of gadget - a tool to use in a website.

Like gadget, Google argues that the genericness of website gadget is further evidenced by the long-standing uncontested generic usage and media usage of the term.  The record indicates that a number of companies and authors have used the term "Web Gadgets" or "Site Gadgets" or "Website Gadgets" to refer to tools for managing or improving a website: (1) "Site Gadgets," Amusive Network, 11/10/2010,  *R. 45-25*; (2) *Web Design: Concepts & Techniques* (3d ed. 2009), *R. 45-31, G-FF-0629675* ("Web site gadgets are small code objects that provide dynamic Web content: clocks, weather reports, breaking news headlines, and so forth."); (3) "SmartWebGadgets.com", 12/21/2010, *R. 45-23 at G-FF-0626466*; (4) "Online Web Gadgets.com," 11/10/2010, *R. 45-28 at G-FF-0626573*; (5) *Pro Web Gadgets Across iPhone, Android, Window, Mac, iGoogle and More*, Sterling Udell, Apress (2009), *R. 45-29 at G-FF-0628897-98* (Chapter 1, "Introducing Web Gadgets").

20

Google also argues that the genericness of website gadget is evidenced by the results of the consumer survey conducted by its expert, Dr. Robert A. Peterson. *R. 44, Exh. A.* Peterson's Report provides that of the 101 participants in the survey who were queried about the status of the term "Website Gadget," only 3% considered it a brand name, compared with 81% who considered it a common name. *Id.*

Based on the well-established common usage of the term website gadget as well as the results of the survey indicating that only 3% of the survey population considered it a brand name, the Court finds that Firefly's Mark, WEBSITE GADGET, merely identifies a category of gadget that, in this case, is to use within a website.

### 4. Whether "WEBSITE GADGET" Is Descriptive

Google contends in the alternative, that even if the Court finds that the term website gadget is not generic, the term is still unprotectable because it is merely descriptive. While the Court has determined that the term website gadget falls within the generic trademark category, it notes that, "[a]lthough these [trademark] categories are meant to be mutually exclusive, they are spectrum-like and tend to merge imperceptibly from one to another. For this reason, they are difficult to define and, quite frequently, difficult to apply." *Vision Center*, 596 F.3d at 116; *see also Soweco, Inc. v. Shell Oil Co.*, 617 F.2d 1178, 1183 (5th Cir.1980) ("although meant as pigeonholes, these useful labels are instead central tones in a spectrum"). Because the Court considers the term website gadget to be more difficult to define than the word gadget, the Court will examine whether or not website gadget is a

descriptive term.

"The concept of descriptiveness must be construed rather broadly. Whenever a word or phrase conveys an immediate idea of the qualities, characteristics, effect, purpose, or ingredients of a product or service, it is classified as descriptive and cannot be claimed as an exclusive trademark." *Zatarains*, 698 F.2d at 792.  In classifying a mark as descriptive, "[a] suitable starting place is the dictionary, for '[t]he dictionary definition of the word is an appropriate and relevant indication of the ordinary significance and meaning of words to the public.'" *Zatarains*, 698 F.2d at 792 (citing *American Heritage*, 494 F.2d at 11 n.5; *Vision Center*, 596 F.2d at 116).

As provided above, The Oxford Dictionaries, Online, defines "gadget" as "a small mechanical device or tool, especially an ingenious or novel one," *R. 58, Exh. 6,* and The Macmillan Dictionary, Macmillan Publishers Limited 2009-2011, defines "gadget" as "a small piece of software that you can add to a website in order to customize it," *R. 45, Exh. 7. The Merriam-Webster Dictionary*, online version, 2011, defines "website" as, "a group of World Wide Web pages usually containing hyperlinks to each other and made available online by an individual, company, educational institution, government, or organization." That the term gadget is defined generally in the dictionary as a tool or device with a practical use and specifically as software to add to a website, and the term website refers to pages on the World Wide Web, in other words - a website, "is at least preliminary evidence" that the terms are descriptive of Firefly's products "in the sense that the words naturally direct

attention to the purpose or function of the product." *See, Zatarains*, 698 F.2d at 792.  Thus, the definition of "website gadget" indicates it is a term of ordinary significance and meaning to the public.  *Id.*

"The 'imagination test' is a second standard used by the courts to identify descriptive terms. This test seeks to measure the relationship between the actual words of the mark and the product to which they are applied. If a term requires imagination, thought and perception to reach a conclusion as to the nature of goods, it is considered a suggestive term. Alternatively, a term is descriptive if standing alone it conveys information as to the characteristics of the product." *Id.*  Here, the connection between Firefly's product WEBSITE GADGET and its identifying terminology "is so close and direct that even a consumer unfamiliar with the product would doubtless have an idea of its purpose or function." *Id. at 792-793; see also, Vision Center*, 596 F.2d at 116–17("the trade name 'Vision Center' is descriptive of a clinic providing optical goods and services"). Accordingly, Firefly's Mark, WEBSITE GADGET, is considered descriptive when examined under the "imagination test."

"Another test used by the courts to distinguish between descriptive and suggestive marks is 'whether competitors would be likely to need the terms used in the trademark in describing their products.'" *Vision Center* at 116 (quoting *Union Carbide* at 379). The record indicates that Firefly's president, Michael L. Spears stated in his deposition that the term website gadget is "descriptive" or "descriptive of our products on several levels" or

…

"effective in terms of describing what it [is]." *R. 45, Exh. 1, Spears Depo. 117:12-15*. The record also indicates that Firefly's account manager, Mallory Juneau Acrey, agreed that the term gadget refers to "some little piece of technology that helps make things easier" and that "the Website Gadget is something that helps you make websites more easily with technology," *Id., Exh. 3, Acrey Depo*, *92:17-93:3*. As both terms naturally occur to one in thinking of the goods and services provided by both parties and as they are virtually indispensable to the vocabulary of the website industry, they lack the quality of inventiveness and imaginativeness characteristic of suggestive trade names. *See Vision Center* at 116. Accordingly, the Court finds that the term website gadget is a descriptive rather than a suggestive term.

### 5. Whether "WEBSITE GADGET" Has Secondary Meaning

"Secondary meaning is used generally to indicate that a mark or dress has come through use to be uniquely associated with a specific source. To establish secondary meaning, a manufacturer must show that, in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself." *Amazing Spaces*, 608 F.3d at 247. "The authorities are in agreement that survey evidence is the most direct and persuasive way of establishing secondary meaning." *Zatarains* at 795 (citing *Vision Center*, 596 F.2d at 119; *Aloe Creme Laboratories, Inc. v. Milsan, Inc*., 423 F.2d 845, 849 (5th Cir.1970); 1 J. McCarthy, *Trademarks and Unfair Competition*, § 15.12(D) (1973).

The record indicates that of the 200 people polled by Dr. Peterson as to secondary meaning of the term "Gadget" and the term "Website Gadget," none of the participants associated either term with Firefly. *R. 44, Exh. A, Peterson Report, p. 10.*  As none of the survey participants identified Firefly as the source of products or services called "Website Gadget," Firefly's Mark is unprotectable.

### 6.  *Likelihood Of Confusion*

Google further argues that there is no likelihood of confusion between Firefly's Marks, "GADGET" and "WEBSITE GADGET," and Google's "Gadget." "In a trademark infringement action, the paramount question is whether one mark is likely to cause confusion with another. 'Likelihood of confusion' means more than a mere possibility; the plaintiff must demonstrate a probability of confusion.  We examine the following nonexhaustive 'digits of confusion' in evaluating likelihood of confusion: (1) the type of trademark; (2) mark similarity; (3) product similarity; (4) outlet and purchaser identity; (5) advertising media identity; (6) defendant's intent; (7) actual confusion; and (8) care exercised by potential purchasers.  No digit is dispositive, and the digits may weigh differently from case to case, 'depending on the particular facts and circumstances involved.'" *Xtreme Lashes, LLC*, 576 F.3d at 226 -227.  "Mark similarity is determined by comparing the marks' appearance, sound, and meaning." *Id.*  As demonstrated by the following analysis in this case, the majority of the digits disfavor confusion.

### i.  *Distinctiveness of marks*

25

"'Type of trademark' refers to the strength of the senior mark. Stronger marks are entitled to greater protection." *Id.*  As the Court has found that the terms "Gadget" and "Website Gadget" are generic and used by numerous companies, they are not strong or distinctive marks.  Moreover, the widespread use of the terms "Gadget" and "Website Gadget" in the sale and marketing of electronic and software goods, limits the protection to which Firefly is entitled.

### ii.  Similarity of marks

This digit favors Firefly's Mark "GADGET" because both Firefly and Google use the term "gadget."  On the other hand, Firefly's term "WEBSITE GADGET" has been displayed in two forms: (1) bulky gray block letters accompanied by a green arrow that circles in on itself; and (2) starting in 2009, in blue and white off-kilter lettering that emphasizes the word "GADGET" under the word "WEBSITE." *R. 38, p. 31; 58-1, Exh. 2.*  Google uses no such distinctive font or design feature in its use of the term "Gadget."  Based on these differences, the "total effect" conveyed by these marks is different and unlikely to generate confusion as to the source of each. *See Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 261 (5th Cir. 1980) (in considering the "total effect of the designation" there was "little similarity" between marks).  This digit favors confusion as to the term Gadget but not as to the term Website Gadget.

### iii.  Similarity of products

Firefly's description of its federal trademark, "GADGET," was for "add-on

applications for a content management system," *R. 45, Exh. 1 at 111:3-5*, while Google does not market it gadgets for use in connection with a content management system.  *R. 38, Hjelmsad Declaration, ¶ 11.*  Firefly states that its "WEBSITE GADGET" is used in the realm of content management systems ("CMS") for efficiently editing the contents and layout of a business or organizational website.  *R. 45, Exh. 1, Spear Depo., 30:14-25.*  Google, on the other hand, refers to gadgets as "mini-applications available for public distribution and inclusion on a personalized webpage" such as clocks, games and news feeds. *R. 45.*  Firefly does not view Google as a competitor for website-development projects, *R. 45, Exh. 1. Spear Depo., 275:6-9; 275:21-23.*  This digit therefore disfavors confusion.

### iv.  Distribution channels

Firefly's and Google's sales and distribution channels as well as their advertising media are likewise distinct and disfavor confusion.  Firefly sells its GADGET primarily to corporate customers in Southwest Louisiana as part of its WEBSITE GADGET CMS, *R. 58,* while Google gadgets are developed primarily by third parties and provided free of charge to individuals across the nation (and across the world) who maintain a personalized iGoogle page.  *R. 40, Hjelmstad Decl, ¶ 11.*

### v.  Actual confusion

This distinction also applies to actual confusion about the origin of Firefly's and Google's products.  "Confusion of origin, not the identity of marks, is the gravamen of trademark infringement."  *Xtreme Lashes*, 576 F.3d at 229.  Firefly lists its customer, Keith

Thibodeaux, as having expressed confusion about the products at issue.  In his December 16, 2010 deposition, however, Thibodeaux confirmed that he never believed that Google's gadgets were somehow endorsed by or licensed from Firefly or that Firefly's WEBSITE GADGET or any applications on Firefly were endorsed by Google.  *R. 45, Exh. 4, Depo. Of Thibodeaux, 59:23-60:5.*  When posed the questions, "[w]ere you at any point confused about whether any particular product was a Firefly product or a Google product?" and "[d]o you know anyone who has been confused about whether a particular product called gadget is a Google gadget ... product or a Firefly product?" - Thibodeaux answered in the negative.  *Id. at 60:6-14.*  As Firefly's GADGET and Google's gadget products at issue have been in use for four years, Firefly's inability to point to a single incident of confusion is "highly significant." *See, Oreck Corp. v. U.S. Floor Systems, Inc*., 803 F.2d 166, 173 (5th Cir. 1986) (after seventeen months of concurrent distribution of parties' vacuum cleaners plaintiff's inability to identify a single instance of confusion as "highly significant").

### vi.  Degree of care by potential purchasers.

As to the degree of care by potential purchasers, it is axiomatic that because Firefly's customers seek out and pay for Firefly to develop their CMS, they have taken great care in choosing Firefly and its products.

### vii.  Advertising media.

Firefly and Google use distinct advertising media.  Firefly conducts only limited advertising, primarily in magazines in Southwest Louisiana.  *R. 45, Exh. 1, 123: 21-124:1.*

Google has not undertaken any formal advertising, but has promoted gadgets to individuals rather than businesses through national press releases and blogs, as well as information on Google's website.  *R. 45, Exhs. 60-61; R. 40, Hjelmstad Decl., ¶ 9.*

**viii.  *Defendant's intent.***

Firefly points to no evidence of any bad-faith effort by Google to usurp or trade on Firefly's goodwill.  Firefly has provided no evidence that Google ever invited comparisons between its gadgets and Firefly's products nor that it targeted Firefly's customers or deceived buyers with Google Gadgets.

Based on the Court's evaluation, the only digit that could possibly indicate a likelihood of confusion is the similarity of Firefly's mark GADGET and Google's "Gadget." Thus, finding that gadget and website gadget are generic, or that website gadget is at best merely descriptive, and negating the likelihood of confusion between Firefly's Marks and Google's gadgets, the Court is compelled to conclude that Firefly's Lanham Act claims must be dismissed.

### B.  *Federal Unfair Competition Claim*

Firefly alleges claims under Federal Unfair Competition in violation of 15 U.S.C. § 1125(a).  "To prove unfair competition under federal law, [plaintiff] must show that the use of its marks by [defendant] is likely to cause confusion among consumers as to the source, affiliation, or sponsorship of [the defendant's] products or services."  *Boston Prof'l Hockey Ass'n, Inc. v. Dallas Cap & Emblem Mfg., Inc.*, 510 F.2d 1004, 1010 (5th Cir.1975);

*Shreveport Louisiana Hayride Co., L.L.C. v. Kent*,  2009 WL 1371712, 7 (W.D.La., 2009) (J. Stagg).  The same "likelihood of confusion" test may be used for unfair competition claims brought under the Lanham Act as for trademark infringement claims. *Two Pesos, Inc. v. Taco Cabana, Inc*., 505 U.S. 763, 780–81 (1992) ("whether we call a violation infringement, unfair competition, or false designation of origin, the test is identical—is there a likelihood of confusion?").  Generally, the same evidence that supports an action for trademark infringement under the Lanham Act also supports an action for unfair competition. *Marathon Mfg. Co. v. Enerlite Prods. Corp*., 767 F.2d 214, 217 (5th Cir.1985).

Having concluded that Firefly has failed to prove likelihood of confusion and Google did not infringe on Firefly's Marks, the Court finds that Google is entitled to summary judgment on Firefly's unfair competition claim.  "It would make no sense to characterize defendant's use as 'fair' within the meaning of the Lanham Act for the purposes of a trademark infringement claim and at the same time characterize his use as 'unfair' for the purpose of a section 43(a) unfair competition claim under the same statute." *Soweco, Inc. v. Shell Oil Co*., 617 F.2d 1178, 1190 (5th Cir. 1980).

## C.  Louisiana Unfair Trade Practice Act ("LUPTA")

Firefly also alleges that Google violated the Louisiana Unfair Trade Practice Act ("LUTPA"), La. R.S. 51:1405.  LUTPA prohibits "[u]nfair methods of competition or deceptive acts or practices in the conduct of any trade or commerce." La.Rev.Stat. § 51:1405(A).  "[A] practice is unfair when it offends established public policy and when the

practice is unethical, oppressive, unscrupulous, or substantially injurious." *Levine v. First Nat. Bank of Commerce*, 948 So.2d 1051, 1065–1066, (La. 2006) (internal citations omitted). To prevail upon a LUTPA complaint, a plaintiff must prove "some element of fraud, misrepresentation, deception or other unethical conduct." *Omnitech Int'l, Inc. v. Clorox Co.*, 11 F.3d 1316, 1332 (5th Cir.1994).  As Firefly has failed to submit any evidence in support of its LUTPA claim, Google's motion for summary judgment in that regard will be granted.

### D.  Federal and State Trademark Dilution

Firefly also alleges claims for federal and state trademark dilution.  Trademark dilution is the weakening of the ability of a mark to clearly and unmistakably distinguish the source of a product.  *See* 15 U.S.C. § 1127.  Dilution may occur through blurring or tarnishing.  Here, Firefly contends that Google's gadget products will likely dilute its marks by blurring.  *R. 58.*  "Blurring involves a diminution in the uniqueness or individuality of a mark because of its use on unrelated goods. "  *Scott Fetzer Company v. House of Vacuums, Inc.*, 381 F.3d 477, 489 (5th Cir.2004).

Under the Trademark Dilution Act of 2006 ("TDRA"), to establish trademark dilution, plaintiffs must first prove that they are the owners "of a famous mark that is distinctive."  15 U.S.C. § 1125(c)(1).[8]  "Specifically, to state a dilution claim under the TDRA, a plaintiff

---

[8]  The TDRA provides that,  "the owner of a famous mark ... shall be entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury." 15 U.S.C. § 1125(c)

must show:

> (1) that the plaintiff owns a famous mark that is distinctive;
>
> (2) that the defendant has commenced using a mark in commerce that allegedly is diluting the famous mark;
>
> (3) that a similarity between the defendant's mark and the famous mark gives rise to an association between the marks; and
>
> (4) that the association is likely to impair the distinctiveness of the famous mark or likely to harm the reputation of the famous mark.

Under the TDRA, the owner of a famous mark has to establish a likelihood of dilution to obtain monetary relief on a federal dilution claim under the Lanham Act.  15 U.S.C. § 1125(c)(5). The TDRA specifically requires that the mark be "*widely recognized by the general consuming public of the United States* as a designation of a source of the goods or services of the mark's owner." 15 U.S.C. § 1125(c)(2)(A) (emphasis added).  "Dilution is a cause of action invented and reserved for a select class of marks—those marks with such powerful consumer associations that even noncompeting uses can impinge on their value." *Board of Regents, University of Texas System ex rel. University of Texas at Austin v. KST Elec., Ltd.,* 550 F.Supp.2d 657, 673 (W.D.Tex.,2008) (internal citations omitted).

The Louisiana Anti-Dilution statute protects a mark based upon its strength, *see* La.Rev.Stat. § 51:223.1, and that strength can be demonstrated by showing a mark to either be distinctive or to have acquired a secondary meaning.  *Prudhomme v. Procter & Gamble Co.*, 800 F.Supp. 390, 395 (E.D.La.,1992) (J. Sear).

As provided under the *Trademark Infringement* discussion, *supra*, the Court has held that Firefly's marks are generic and/or descriptive without secondary meaning.  Thus, the marks meet neither the TDRA specific requirement that the marks be "widely recognized by the general consuming public of the United States" nor the state law requirement that the mark be either distinctive or have acquired a secondary meaning.  Thus, Google's motion as to Firefly's Federal and State dilution claims will be granted.

### E.  Cancellation of Trademarks

Google filed a counterclaim against Firefly for cancellation of its federal registrations pursuant to 15 U.S.C. § 1119[9] as well as its state registrations.  *R. 11, ¶¶ 71 & 72.*  Section 1119 of the Lanham Act provides:  "In any action involving a registered mark the court may determine the right to registration, order the cancellation of registrations, in whole or in part, restore canceled registrations, and otherwise rectify the register with respect to the registrations of any party to the action."   15 U.S.C. § 1119.   "Generic terms are not registrable, and a registered mark may be canceled at any time on the grounds that it has become generic.  *See* [Lanham Trade-Mark Act] §§ 2, 14(c), 15 U.S.C. §§ 1052[(e)], 1064[(3)].  A 'merely descriptive' mark, in contrast, describes the qualities or characteristics of a good or service, and this type of mark may be registered only if the registrant shows that

---

[9]  A request for cancellation pursuant to § 1119 ordinarily is made as a counterclaim in an infringement action.  *See* 5 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 30:109 (4th ed. Westlaw 2010) (noting that a "defendant charged with infringement of a registered mark may counterclaim for cancellation of that registration" under § 1119); *see also, Nasalok Coating Corp. v. Nylok Corp.*, 522 F.3d 1320, 1325 (Fed.Cir.2008).

it has acquired secondary meaning, i.e., it 'has become distinctive of the applicant's goods in commerce.'" §§ 2(e), (f), 15 U.S.C. §§ 1052(e), (f)." *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc*., 469 U.S. 189, 194 (1985).  "Pursuant to § 14, a mark may be canceled on the grounds that it is merely descriptive only if the petition to cancel is filed within five years of the date of registration. § 14(a), 15 U.S.C. § 1064[(1)]." *Id.*

The Fifth Circuit has held that when a court determines that a mark is either a generic term or a descriptive term lacking secondary meaning, the purposes of the Lanham Act are well served by an order canceling the mark's registration. *Zatarains*, 698 F.2d at 792.  As the record indicates that Firefly registered its trademarks in 2009 and the Court has determined that Firefly's federally registered trademarks, "GADGET" and "WEBSITE GADGET," are generic and/or merely descriptive without secondary meaning, Google's motion to cancel Firefly's federal registration will be granted.

La.Rev.Stat. 51:213 provides that the Secretary of State is authorized to promulgate rules and regulations for the filing of trademarks in Louisiana.  Louisiana courts determine whether a trade name is protectable using the same categories used by federal courts.  *Gulf Coast Bank v. Gulf Coast Bank and Trust Company*, 652 So.2d 1306, 1313 (La.4/10/95). Generic terms are considered public domain and can never be protected as trade names.  *Id.* Descriptive terms are generally not protected, but may acquire distinctiveness through a secondary meaning thereby receiving protection as a trade name.  *Id.* at 1314.  Section 219, provides for the cancellation of a registered trademark and states in pertinent part:

> The secretary of state shall cancel from the register:
>
> . . .
>
> (5) When a court of competent jurisdiction shall order cancellation of a registration on any ground.

La.Rev.Stat. 51:219.  Based on the foregoing, the Court will grant Google's motion to cancel Firefly's state registration of WEBSITE GADGET.

### *IV.  Conclusion*

The Court finds that Firefly's Marks, GADGET and WEBSITE GADGET, are generic and/or descriptive without distinction or secondary meaning.  Accordingly, the Motion for Summary Judgment filed by Google will be granted and Firefly's claims for  trademark infringement under the Lanham Act, federal unfair competition, LUPTA and federal and state dilution will be dismissed.  Finding that all the requirements for cancellation of Firefly's federal marks have been met, the Court will order that Federal Registration Numbers 3,711,998 and 3,730,874 are cancelled, and will direct the Clerk of Court to provide a certified copy of the judgment that will issue pursuant to this ruling, to the Director of the U.S. Patent and Trademark Office pursuant 15 U.S.C. § 1119 for appropriate cancellation of the foregoing federal registration numbers.  Further, the Court will order that the Louisiana Secretary of State cancel from the state registry Firefly's mark, WEBSITE GADGET, pursuant to La.Rev.Stat. 51:219.